## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AL OTRO LADO**
P.O. Box 907
Maywood, CA 90270

*Plaintiff*

v.

**U.S. CUSTOMS AND BORDER PROTECTION**
1300 Pennsylvania Avenue NW,
Washington, DC 20004

*Defendant*

Civil Action No. 1:24-cv-925

## PLAINTIFF'S FIRST AMENDED COMPLAINT

1.     Congress tasked United States Customs and Border Protection ("CBP") with halting fentanyl smuggling and implementing effective fentanyl policies.

2.     Congress also tasked CBP with making all records described by 5 U.S.C. § 552(a)(2) publicly available in CBP's online FOIA reading room.

3.     Congress did not task CBP with distributing fentanyl, especially not to CBP officials.

4.     It is imperative for public safety that CBP adopt and enforce appropriate fentanyl protocols and policies as required by Congress.  Those policies must be written to protect the public and CBP employees and not for the personal benefit of any one government official.

5.     It is also imperative that CBP make its policies public, both for the sake of public transparency and to verify that CBP does in fact have concrete, written policies governing its offices, particularly the CBP Office of the Chief Medical Officer ("OCMO").

6.     A whistleblower has now accused the CBP official charged with writing its fentanyl policy of writing policies aimed only at securing his personal access to fentanyl.

1

7.      Fentanyl, the synthetic opioid many times more potent than heroin and lethal in miniscule amounts, annually kills tens of thousands of people in the United States.[1]  Opioids now cause one in every twenty-two American deaths.[2]

8.      According to CBP, the federal organization chiefly responsible for intercepting smuggled fentanyl, fentanyl is one of its primary focuses.[3]  CBP consistently requests additional funding to detect and seize smuggled fentanyl at the U.S. border.[4]

9.      While most domestically consumed fentanyl is smuggled in from abroad, little correlation exists between immigrants and fentanyl: American citizens,[5] sometimes including Department of Homeland Security ("DHS") officers,[6] comprise the vast majority of fentanyl smugglers.

10.      Despite federal efforts to combat the influx of fentanyl, opioid overdose deaths continue to rise.

---

[1] Quinn Owen, *Border officials seizing a lot of fentanyl, but say it's a complicated problem to solve*, ABC News, (Dec. 1, 2023), https://abcnews.go.com/Politics/border-officials-seizing-lot-fentanyl-complicated-problem-solve/story?id=105255151.

[2] Tara Gomes, Shaleesa Ledlie, Mina Tadrous, et al, Trends in Opioid Toxicity–*Related Deaths in the US Before and After the Start of the COVID-19 Pandemic*, 2011-2021, JAMA NETW OPEN (Jul. 7, 2023), doi:10.1001/jamanetworkopen.2023.22303.

[3] CBP, *CBP: America's Front Line Against Fentanyl*, (Mar. 6, 2024), https://www.cbp.gov/frontline/cbp-america-s-front-line-against-fentanyl.

[4] Laura Strickler, Julia Ainsley and Didi Martinez, *Scanners that spot smuggled fentanyl at the border sit unused because Congress hasn't provided the cash to install them,* NBC News, (Mar. 5, 2024, 6:30AM), https://www.nbcnews.com/politics/immigration/border-fentanyl-scanners-unused-congress-provided-no-money-rcna141432.

[5] Christian Penichet-Paul, *Illicit Fentanyl and Drug Smuggling at the U.S.-Mexico Border: An Overview*, National Immigration Forum (Oct. 25, 2023), https://immigrationforum.org/article/illicit-fentanyl-and-drug-smuggling-at-the-u-s-mexico-border-an-overview/;
Joel Rose, *Who is sneaking fentanyl across the southern border? Hint: it's not the migrants*, NPR (Aug. 9, 2023, 5:00AM), https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs.

[6] Francisco Ugarte, *Among the drug traffickers you don't hear about: The United States Border Patrol*, (Jul. 18, 2023), https://48hills.org/2023/07/among-the-drug-traffickers-you-dont-hear-about-the-united-states-border-patrol/; Emily Green, *A Border Agent Was Just Charged With Taking Bribes from Cartels to Smuggle Drugs*, Vice News, (Jul. 6, 2023), https://www.vice.com/en/article/5d9d48/a-border-agent-was-just-charged-with-taking-bribes-to-smuggle-drugs.

11.     Yet beyond blaming immigrants or lack of law enforcement funding, an additional explanation exists for the growing influx of fentanyl: the failure of CBP leadership to create or enforce fentanyl policies and certain CBP officials' focus on gaining personal access to fentanyl.

12.     To protect CBP employees and the public, in 2020 Congress passed the Synthetic Opioid Exposure Prevention and Training Act ("Act"), requiring CBP to adopt appropriate fentanyl policies, supply employees with adequate protective gear, and provide emergency response training to stop opioid deaths.

13.     Yet despite having designated fentanyl as a priority, a 2023 Office of the Inspector General Report found that CBP had failed to adopt required fentanyl policies.  CBP admitted its failure and promised to correct the oversight.[7]

14.     Despite this promise, CBP's online reading room, where all non-exempt CBP policies must be published, still lacks any relevant policies or staff instructions regarding the safe handling, detection, or storage of fentanyl or protective measures ensuring employee safety.[8]

15.     The CBP official charged with creating CBP fentanyl policy is Chief Medical Officer ("CMO") Dr. Alexander Eastman.[9]

16.     Dr. Eastman has made no known attempts to issue the required CBP fentanyl policies.

17.     Yet according to a recent CBP whistleblower letter (Exhibit 1), Dr. Eastman has issued a single fentanyl policy: in September of 2023, he wrote an Office of the Chief Medical Officer ("OCMO")

---

[7] DHS, Office of the Inspector General, *CBP Did Not Fully Implement the Requirements of the Synthetic Opioid Exposure Prevention and Training Act*, (Oct. 26, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-10/OIG-24-01-Oct23.pdf.

[8] CBP, *FOIA Reading Room*, https://www.cbp.gov/site-policy-notices/foia/reading-room?field_foia_category_list_value=All&title=fentanyl&year= (last accessed on March 31, 2024).

[9] DHS, Office of the Inspector General, *supra* note 7, p. 8 ("CBP's Office of the Chief Medical Officer (OCMO) is responsible for implementing the requirements of the Act and, . . .will develop a CBP-wide policy . . .").

opioid acquisition policy designed to help him acquire fentanyl for his personal possession.[10]

18.     Among other allegations, Dr. Eastman is also alleged to be or have been under investigation for other instances of improperly acquiring and disposing of controlled narcotics.

19.     Plaintiff Al Otro Lado ("Plaintiff") has requested access to CBP's fentanyl safety policy, Dr. Eastman's fentanyl policies, his fentanyl orders and communications, and related records.

20.     Dr. Eastman remains the acting CBP CMO and is still in charge of setting the organization's medical priorities and policies.

21.     The CBP reading room is entirely devoid of CBP OCMO policies.

22.     CBP possesses any existing CBP fentanyl policy and, should it exist, Dr. Eastman's allegedly self-serving OCMO fentanyl policy.

23.     The existence of these policies is a matter of the greatest public concern. If the whistleblower is correct, the health of all CBP employees relies on Dr. Eastman, yet his policies focus exclusively on personally obtaining fentanyl.

24.     If the whistleblower is incorrect, then ordering release of Plaintiff's requested records will swiftly dispel unwarranted, baseless suspicion and reveal Dr. Eastman as a blameless public servant.

25.     CBP's failure to provide OCMO records is just part of its larger pattern of failing to supply policies and other § 552(a)(2) records in its possession to the public.

26.     Plaintiff thus brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking relief compelling CBP to properly respond to AOL's FOIA request and make responsive records promptly available.

---

[10] Government Accountability Project, *Whistleblowers Disclose CBP Leadership Undermined Medical Oversight*, Feb. 16, 2024, https://whistleblower.org/press-release/whistleblowers-disclose-cbp-leadership-undermined-medical-oversight/; Julia Ainsley, *The top doctor for CBP tried to order fentanyl lollipops for a helicopter mission in New York, whistleblowers say*, NBC News, Feb. 16, 2024, https://www.nbcnews.com/politics/immigration/cbp-doctor-tried-order-fentanyl-lollipops-helicopter-mission-new-york-rcna139116.

## PARTIES

27.     Plaintiff Al Otro Lado ("AOL") is a non-profit, non-partisan organization based primarily in Los Angeles, California.  AOL is a legal services organization serving indigent deportees, migrants, refugees, and their families.  Al Otro Lado's mission is to coordinate and to provide screening, advocacy and legal representation for individuals in immigration proceedings and detained by DHS, to seek redress for civil rights violations, and to provide assistance with other legal and social service needs.  Al Otro Lado regularly provides information and analysis to the media, the general public, and human rights monitoring bodies and disseminates information about its work and conditions on the U.S.-Mexico border and in immigration detention through its various social media accounts and website.  Disseminating information to the public is a critical component of Al Otro Lado's work. Al Otro Lado does this at no cost to the public.

28.     Defendant Customs and Border Protection ("CBP") is a component of the U.S. Department of Homeland Security ("DHS") and an "agency" within the meaning of 5 U.S.C. § 552(f)(1).

29.     CBP has possession of and control over the records requested by AOL.

## JURISDICTION AND VENUE

30.     These claims being brought pursuant to 5 U.S.C. § 552(a)(3)(A) and 5 U.S.C. § 552 (a)(2), this Court has jurisdiction under 5 U.S.C. § 552 (a)(4)(B), the Administrative Procedures Act, 5 U.S.C. § 701 et. seq., and U.S.C. § 1331 (federal question) and 28 U.S.C. § 1391(e) (federal agency).

31.     This Court has jurisdiction over Plaintiff's 5 U.S.C. § 552(a)(3) FOIA claims because CBP violated FOIA's timing requirements by failing to issue an appropriate determination within the specified period, thereby permitting judicial review without exhaustion of administrative appeals.  5 U.S.C. § 552(a)(6)(C)(i) ("Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such

5

request if the agency fails to comply with the applicable time limit provisions of this paragraph.").

32.    This Court has jurisdiction over Plaintiff's 5 U.S.C. § 552 (a)(2) claims because all reading room records must be already available online.  And although Plaintiff has submitted an (a)(2) notification to CBP before filing suit, no FOIA request is required in order for this Court to have jurisdiction. *Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 846 F.3d 1235, 1241 (D.C. Cir. 2017) ("*CREW II*") ("Equally certain under our case law, a plaintiff may bring an action under FOIA to enforce the reading-room provision, and may do so without first making a request for specific records under section 552(a)(3).") (quoting *Irons v. Schuyler*, 465 F.2d 608, 614 (D.C. Cir. 1972) ("[T]he opinions and orders referred to in Section 552(a)(2), when properly requested, are required to be made available, and . . . such requirement is judicially enforceable without further identification under Section 552(a)(3), even though the agency has failed to make them available as required by Section 552(a)(2).")

33.    This Court has jurisdiction to, among other remedies, enjoin the agency from withholding agency records and order production of improperly withheld records.  *See* 5 U.S.C. § 552(a)(4)(B) ("the district court of the United States . . . in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.")

34.    As a jurisdictional matter, permitting CBP more time to complete a determination would require a showing of exceptional circumstances and due diligence in locating and processing requested records.  *See* 5 U.S.C. § 552(a)(6)(C) ("If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records.")

35.    Venue is proper within this District under 28 U.S.C. § 1391(e) and 5 U.S.C. § 552(a)(4)(B).

### STATUTORY FRAMEWORK

### *§ 552(a)(3) FOIA Requests*

36.    Any member of the public may request records from an agency of the United States under FOIA.

37.    An agency that receives a FOIA request must issue a determination in writing to the requester within 20 business days after receipt of the request. 5 U.S.C. § 552(a)(6)(A)(i). FOIA provides for an extension of this deadline "[i]n unusual circumstances" but limits this extension to "ten working days." 5 U.S.C. § 552(a)(6)(B)(i).

38.    A "determination" demands "more than mere acknowledging receipt of the Request and stating the agency will produce any non-exempt records that it may later locate." *Electronic Privacy Information Center v. Department of Justice*, 15 F.Supp. 3d 32, 40 (D.D.C. 2014). Rather, "in order to make a 'determination' and thereby trigger the administrative exhaustion requirement, the agency must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Responsibility and Ethics in Washington v. Federal Election Commission*, 711 F.3d 180, 188 (D.C. Cir. 2013) ("*CREW*").

39.    FOIA requires an agency to make "promptly available" all responsive records. 5 U.S.C. § 552(a)(3)(C)(i).

40.    An agency may deny access to responsive records only if disclosure is "prohibited by law" or if: (1) those records falls within one of the nine FOIA statutory exemptions, 5 U.S.C. § 552(b)(1)-(9), *and* (2) "the agency reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i).

41.    Even if an exemption applies and record disclosure would foreseeably harm an exemption-protected interest, the agency must "take reasonable steps necessary to segregate and release nonexempt

information." 5 U.S.C. § 552(a)(8)(A)(ii).

### *§ 552(a)(2) Reading Room Disclosures*

42.     CBP is currently in violation of its mandatory § 552(a)(2) obligations for failing to post

online required records or provide an index of those records.

43.     CBP is obligated to publish on its website those records required by § 552(a)(2).

44.     CBP does not publish on its website all of those records required by§ 552(a)(2).

45.     In relevant part, § 552(a)(2)—sometimes referred to as the reading room requirement—

mandates that:

> Each agency, in accordance with published rules, shall make available for
> public inspection in an electronic format—
> **(A)**final opinions, including concurring and dissenting opinions, as well
> as orders, made in the adjudication of cases;
> **(B)**those statements of policy and interpretations which have been adopted
> by the agency and are not published in the Federal Register;
> **(C)**administrative staff manuals and instructions to staff that affect a
> member of the public;
> **(D)**copies of all records, regardless of form or format—
> **(i)**that have been released to any person under paragraph (3); and
> **(ii)(I)**  that  because  of  the  nature  of  their  subject  matter,
> the agency determines have become or are likely to become the subject of
> subsequent requests for substantially the same records; or
> **(II)**that have been requested 3 or more times; and
> **(E) . . .** current indexes providing identifying information for the public as
> to any matter . . . . required by this paragraph to be made available or
> published . . . [including] a general index of the records referred to under
> subparagraph (D).

46.     DHS's regulation 6 CFR 5.2, "Proactive disclosure of DHS records," accordingly require

that agency components, such as CBP, proactively disclosure § 552(a)(2) records on an ongoing basis

(emphasis added): "Each component is responsible for determining which of its records are required to be

made publicly available, as well as identifying additional records of interest to the public that are

appropriate for public disclosure, and for posting and indexing such records. *Each component shall ensure*

*that posted records and indices are updated on an ongoing basis."*

47.     Because § 552(a)(2) disclosure is mandatory, D.C. Circuit precedent permits a plaintiff to bring a § 552(a)(2) claim even without having first filed a corresponding subsection (a)(3) FOIA request for those records.[11]

48.     D.C. Circuit precedent bars a judicial order requiring an agency to publish records online to fulfil its § 552(a)(2) obligations.[12]   However, nothing "prevents a district court from, consistent with section 552(a)(4)(B), ordering an agency to provide to the plaintiff documents covered by the reading-room provision."[13]

49.     CBP must make Plaintiff's § 552(a)(2) records available either by publishing them online or by making them directly available to Plaintiff.

## STATEMENT OF FACTS

*From 2020 until at least 2023, CBP illegally stockpiled fentanyl and failed to properly create and implement fentanyl safety policies as ordered by Congress.*

50.     CBP recognizes the threat posed to the American public by fentanyl and recognizes itself as the frontline defense of the American people against fentanyl: "Across our nation, communities are suffering the scourge of an illicit synthetic opioid epidemic that is challenging law enforcement,

---

[11] AL OTRO LADO, INC. v. IMMIGRATION AND CUSTOMS ENFORCEMENT 1:23-cv-01525-JMC, Minute Order December 19, 2023 (quoting *Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 846 F.3d 1235, 1240 (D.C. Cir. 2017) ("*CREW II")* ("[A] plaintiff may bring an action under FOIA to enforce the reading-room provision, and may do so without first making a request for specific records under section 552(a)(3).") (quoting *Irons v. Schuyler*, 465 F.2d 608, 614 (D.C. Cir. 1972) ("[T]he opinions and orders referred to in Section 552(a)(2), when properly requested, are required to be made available, and ... such requirement is judicially enforceable without further identification under Section 552(a)(3), even though the agency has failed to make them available as required by Section 552(a)(2).")).

[12] *CREW II*, at 1243 (D.C. Cir. 2017) ("Given *Kennecott's* construction of section 552(a)(4)(B), we think it clear that a court has no authority under FOIA to issue an injunction mandating that an agency 'make available for public inspection' documents subject to the reading-room provision . . .").

[13] *Id.*

healthcare, and social service resources. . . . [CBP] is positioned to lead the federal government's efforts to prevent these poisons from entering our country."[14]

51.    On December 27, 2020, the President signed into law the Synthetic Opioid Exposure Prevention and Training Act ("Act"), a law designed expressly to help CBP safely fulfill its role as guardian of the United States against the threat of fentanyl.

52.    In relevant part, the Act required CBP to "issue a policy to CBP's workforce that specifies effective protocols and procedures for safely handling potential synthetic opioids to reduce the risk of injury or death resulting from accidental exposure and enhance post-exposure management."  Existing DHS guidance also requires CBP to have promulgated "administrative controls such as written safety policies, standard operating procedures, and training reduce the duration, frequency, and severity of exposure to illicit substances" and a "policy on the dangers of fentanyl, actions employees can take to protect themselves from potential exposure, and procedures to follow if a person is exposed, to protect personnel and reduce the risk of injury or death."[15]

53.    CBP has an acknowledged history of inappropriately retaining and storing fentanyl and other seized narcotics.

54.    A 2021 OIG report entitled "CBP Needs Additional Oversight to Manage Storage of Illicit Drugs," describes CBP's systemic failure to effectively store and destroy enormous quantities of illicit drugs.[16]  Instead of obeying federal law and routinely destroying drug seizures, CBP had been unlawfully stockpiling enormous quantities of narcotics.  In total, OIG found CBP in possession of "more than

---

[14] CBP, *CBP strategy to combat fentanyl and other synthetic drugs* (Oct. 26, 2023), https://www.cbp.gov/document/report/cbp-strategy-combat-fentanyl-and-other-synthetic-drugs. *See also CBP, CBP strategy to combat fentanyl and other synthetic drugs,* (Oct. 26, 2023), https://www.cbp.gov/sites/default/files/assets/documents/2023-Oct/cbp-fentanyl-strategy.pdf.

[15] DHS, Office of the Inspector General, *supra* note 7.

[16] DHS, Office of the Inspector General, *CBP Needs Additional Oversight to Manage Storage of Illicit Drugs*, (March 18, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-04/OIG-21-18-Mar21-Redacted.pdf.

400,000 pounds of dangerous and toxic drugs such as cocaine, methamphetamines, and fentanyl that it should have destroyed."[17]

55.      Despite Congress's clear command and the obvious need for adopting appropriate policies, CBP did nothing.  In its 2023 investigative report, the Department of Homeland Security Office of the Inspector General ("OIG") determined that CBP, in defiance of both the Act and internal DHS policy, failed to issue "a component-wide policy to its workforce for safely handling potential synthetic opioids."[18]

56.      CBP agreed with OIG.  As a remedy, CBP promised that "CBP's Office of the Chief Medical Officer (OCMO) is responsible for implementing the requirements of the Act" and would "develop a CBP-wide policy regarding the availability of, use of, and training on naloxone" as well as "CBP-wide procedures for distributing naloxone to the CBP workforce," and "refresher training for all at-risk personnel on the risk of exposure to opioids and how to administer naloxone."[19]

57.      The person in charge of creating these policies was and is Dr. Alexander Eastman.

***In 2024, a whistleblower revealed that CBP was or had investigated Dr. Eastman, CBP's CMO and the official charged with creating CBP fentanyl safety policies, for attempts to personally obtain fentanyl.***

58.      On February 16, 2024, a Customs and Border Protection ("CBP") whistleblower released a letter describing various abuses and mismanagements by CBP officials and contractors, focusing in particular on "reports of wrongdoing by the acting CBP Chief Medical Officer," Alexander Eastman, "who currently leads the office responsible for CBP's medical mission."[20]

---

[17] By point of comparison, this amount of illegally stockpiled drugs exceeded all CBP drug seizures in 2021. *See* CBP, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.
[18] *Id.*
[19] *Id.* at p. 11.
[20] Andrea Meza, *Protected Whistleblowers' Disclosures Regarding Failure of CBP Leadership and CBP Office of Acquisition to Oversee its Medical Services Contract with Loyal Source Government Services and Ongoing Wrongdoing by Acting CBP Chief Medical Officer*, Government Accountability Project (Feb. 16, 2024), https://whistleblower.org/wp-content/uploads/2024/02/02-16-2024-CBP-Medical-Services-Whistleblower-Disclosure.pdf

59. The letter accuses Dr. Eastman of a long and scandalous series of oversights, mistakes, and acts of alleged malfeasance, including: sexually harassing women in front of his staff; minimizing a contractor's obvious failures to provide appropriate medical care; wasting taxpayer dollars on extracurricular travel; verbally harassing his staff; unlawfully hiring contractors; providing sensitive information to contractors lacking appropriate security clearance; using non-competitively hired contractors to replace federal employees; appointing a non-physician to act in his stead while Eastman was on vacation; hiring an unqualified friend for an OCMO leadership position; attempting to use unvetted NGO volunteers to staff border facilities; attacking OCMO's electronic medical records system in an attempt to have contractor Deloitte awarded a contract to create a new record system.

60. Among its many allegations of incompetence and malfeasance, the whistleblower letter accuses Eastman of using his position to secure fentanyl for his personal possession.

61. According to the whistleblower, in September 2023, Dr. Eastman traveled to the United Nations General Assembly in New York. In the week before his trip, "Dr. Eastman spent copious hours of his and OCMO staff time, directing the OCMO staff to urgently help him procure fentanyl lollipops, a Schedule II narcotic."[21]

62. The relevant passage from page 12 of the whistleblower letter reads as follows:

_____

[21] *Id.* at 12.

***Attempts to Procure Fentanyl Lollipops for Attendance at the U.N. General Assembly in New York City***

In September 2023, Dr. Eastman visited New York in conjunction with the United Nations General Assembly (UNGA),[18] which is typically attended by heads of UN member states.[19] While CBP Air and Marine Operations and the United States Secret Service did have a joint security mission at UNGA, it was not clear why the presence of the Acting CBP Chief Medical Officer was required, nor did Dr. Eastman effectively communicate to OCMO staff why he was prioritizing the trip over managing CBP medical operations at the border. Indeed, initially OCMO was determined to not have a role in UNGA (Exhibit C).

Yet, in the week before departing for the U.N. General Assembly, Dr. Eastman spent copious hours of his and OCMO staff time, directing the OCMO staff to urgently help him procure fentanyl lollipops, a Schedule II narcotic, so that he could bring them on the CBP Air and Marine Operations helicopter on which he would be a passenger in New York City (Exhibit C). Dr. Eastman claimed that his possession of fentanyl lollipops was necessary in case a CBP operator might be injured, or in case the CBP Air and Marine Operations team encountered a patient in need. Over half a dozen CBP employees were involved in handling the urgent purchase request and navigating the hurdles of purchasing and handling highly regulated narcotics. OCMO senior leadership reported concern about these efforts to Operations Support leadership via email on September 5, 2023 (Exhibit D).

63.   When his staff questioned the lack of an OCMO policy for procuring, storing, and disposing of Schedule II drugs, "Dr. Eastman proceeded to write his own policy for this purpose, which initially omitted language regarding the storage and disposal of the narcotics."

64.   OCMO staff wrote into the draft policy language regarding storage and disposal of narcotics, basing this language on existing Drug Enforcement Administration Diversion policies. Dr. Eastman deliberately removed this language from the policy and then authorized its adoption with his signature. OCMO staff warned Dr. Eastman that his policy might be illegal unless he sought and received authorization from senior CBP leadership.

65.   Dr. Eastman refused to seek approval from senior CBP leadership and left his newly written fentanyl policy in effect.

66.   Armed with his personally tailored fentanyl policy, Dr. Eastman commanded OCMO staff to obtain the fentanyl lollipops he demanded for his personal possession.

67. Satisfying this urgent personal request from the CBP CMO himself demanded many hours of time and attention from over half a dozen CBP employees.[22]

68. Dr. Eastman ultimately failed to obtain this personal fentanyl supply only because a vendor could not be located in time.

69. The relevant passage from page 13 of whistleblower letter reads as follows:

. .

**Attempts to Self-Authorize a Change in Narcotics Policy to Allow the Procurement of Fentanyl Lollipops**

Dr. Eastman's attempts to order fentanyl lollipops were initially unsuccessful because there was not enough funding available for the purchase. Then, OCMO staff questioned the fact that there was not an OCMO policy regarding the procurement, storage, and disposal of Schedule II narcotics (Exhibit E, Exhibit F). Dr. Eastman proceeded to write his own policy for this purpose, which initially omitted language regarding the storage and disposal of the narcotics.

Though OCMO staff wrote in language to this effect based on existing Drug Enforcement Administration Diversion policies, Dr. Eastman then removed this language, signed the policy himself, (Exhibit G) and failed to send the policy to senior CBP leadership for review and approval, despite warnings from OCMO senior staff that authorizing such policy without higher approval could be illegal. With this self-signed policy, Dr. Eastman directed OCMO staff to order the fentanyl lollipops. Ultimately, the narcotics were not ordered by OCMO because a vendor could not be found in time.

**The CBP whistleblower alleges prior or ongoing CBP investigations into Dr. Eastman's improper procurement and disposal of opioids.**

70. Of deepest concern to Plaintiff and the public, CBP already suspected Dr. Eastman's propensity for narcotic mismanagement: "Dr. Eastman has been investigated in the past by the CBP Office of Professional Responsibility regarding improper ordering and procurement of narcotics and illegal storage of those narcotics along with a friend of his who is a paramedic and pilot for CBP Air and Marine." The whistleblower letter alleges that this friend was the pilot for Dr. Eastman's trip to the UN meeting.[23]

71. The relevant passage from pages 12 and 13 of the whistleblower letter reads as follows:

_____

[22] *Id.* at p. 12.
[23] *Id.* at pp.12-13.

Of note, Dr. Eastman has been investigated in the past by the CBP Office of Professional Responsibility regarding improper ordering and procurement of narcotics and illegal storage of those narcotics along with a friend of his who is a paramedic and pilot for CBP Air and Marine

Operations. Importantly, this same friend was also the CBP helicopter pilot during Dr. Eastman's trip to New York City for UNGA and is the same friend who Dr. Eastman is currently attempting to detail into OCMO for a critical leadership position.[20]

72.    Taken as a whole, the whistleblower letter alleges that the CBP CMO, the person charged with creating CBP fentanyl safety policy, used his position to obtain fentanyl for his personal possession and that CBP knew of his improper obtaining and disposal of fentanyl.

### CBP's FOIA reading room contains no fentanyl policies, no opioid policies, and no OCMO policies whatsoever.

73.    FOIA requires CBP to post in its reading room all policies not printed in the Code of Federal Regulations, a category including the fentanyl safety policies required by the Act and promised to OIG.  *See* § 552(a)(2)(B).

74.    CBP's reading room contains no policies at all relating to fentanyl, neither the policies required by the Act nor the policy written by Dr. Eastman.

75.    As late as March 27, 2024, typing the word "fentanyl" into CBP's reading room search function yields no records, only the message that "your search generated zero results.  Please verify your search criteria and try again."[24]

76.    A search of CBP's reading room for "opioids" likewise yields no records at all.[25]

77.  CBP, the designated primary defender against fentanyl smuggling, has generated fentanyl-related policies and staff instructions.

---

[24] FOIA Reading Room, "fentanyl" search results, (accessed Mar. 27., 2024), https://www.cbp.gov/site-policy-notices/foia/reading-room?field_foia_category_list_value=All&title=fentanyl&year=.
[25] FOIA Reading Room, "opioid" search results,  (accessed Mar. 27, 2024), https://www.cbp.gov/site-policy-notices/foia/reading-room?field_foia_category_list_value=All&title=opioid&year=.

78.     Congress has ordered CBP, through CMO Dr. Eastman, to create fentanyl safety protocols and policies.

79.     Failing to have promulgated any fentanyl safety protocols or policies would be in direct defiance of the Act, CBP's promise to OIG, and would also unnecessarily endanger the lives of CBP employees and the public.

### *Plaintiff filed a first FOIA request for Dr. Eastman's fentanyl orders and communications.*

80.     On February 16, 2024, AOL submitted a FOIA request to CBP seeking the following:

1.  All purchase orders for fentanyl lollipops, oral transmucosal fentanyl citrate, morphine, and Dilaudin dated between February 16, 2019 and the date of this search.
2.  All emails from Dr. Alexander Eastman containing the key words "fentanyl", "oral trans mucosal", or "lollipops" sent between February 16, 2019 and the date of this search.

81.     CBP assigned this request tracking number CBP-FO-2024-061005.

### *CBP's FOIA response letter failed to address or properly deny Plaintiff's first FOIA request, failing to meet the statutory requirements for a sufficient determination.*

82.     On March 20, 2024, CBP sent Plaintiff a response letter, denying Plaintiff's FOIA request for "records pertaining to purchase orders for fentanyl lollipops and email communications of Dr. Alexander Eastman from February 16, 2024 to the present."

83.     Plaintiff's FOIA request did not ask for fentanyl emails and purchase orders from February 16, 2024 to present.

84.     Plaintiff's FOIA request asked for records from February 16, 2019 until the date of the search.

85.     After misconstruing Plaintiff's request, CBP then denied its artificially constructed request, claiming that the requested records are "currently part of an open and pending investigation and/or CBP action."  Accordingly, CBP denied Plaintiff's request on the grounds that "all pages of responsive records are being withheld in their entirety pursuant to Title 5 U.S.C. section 552(b)(7)(A)."

86.     CBP's response letter stated that "CBP has considered the foreseeable harm standard when reviewing the record set and has applied the FOIA exemptions as required by the statute and the Attorney General's guidance."

87.     CBP's response letter did not include an affirmation of reasonably foreseeable harm should the records be released, nor did it analyze why it was reasonably foreseeable that releasing the requested records would damage an interest protected by the cited exemption.

88.     A statutorily sufficient determination must include "the reasons for withholding any documents." *CREW*, 711 F.3d at 188.

89.     As summarized by the DHS Foreseeable Harm Standard Analysis Memorandum, because FOIA requires an agency to affirm that it "reasonably foresees that disclosure would harm an interest protected by" a FOIA exemption before withholding records under an exemption "identifying a FOIA exemption that applies to a responsive record now is usually not the end of the analysis of whether the record should be withheld." The "foreseeable harm standard is not satisfied by generalized and conclusory statements, but instead requires a more rigorous and particularized showing of harm for each category of documents to be withheld."

90.     Under the same DHS memo, invocations of Exemption 7, as CBP has done here, requires at minimum a "Concise Foreseeable Harm Analysis" and usually does not—but may—require "a detailed foreseeable harm analysis." Only Exemption 1 and 3 may be invoked without providing some kind of analysis.

91.     Here, CBP has provided no analysis whatsoever justifying its withholdings, instead stating only that it "considered the foreseeable harm standard." This response fails to satisfy FOIA and DHS requirements. It provides no analysis at all. It does not rise even to the level of a conclusion—CBP is not even asserting that the foreseeable harm standard has been met, simply that it considered that standard.

92.     CBP's response letter does not indicate the scope of the records it will produce upon

conclusion of the claimed investigation or what exemptions it may then invoke to further bar Plaintiff's

access to its requested records.

93.     CBP's denial letter is not a statutorily sufficient determination because it (1) did not address

Plaintiff's actual request; (2) denied record access by employing an exemption but without making a

finding of reasonably foreseeable harm based on analysis of the documents requested and the exemption

invoked, and; (3) not indicating the scope of the records it ultimately intends to produce.

94.     Because CBP failed to issue a timely determination, this Court has jurisdiction over this

first FOIA request.

### *CBP's response letter to Plaintiff's second FOIA request failed to include an appropriate foreseeable harm analysis or segregate responsive records.*

95.     On March 18, 2024, Plaintiff again sent CBP a FOIA request asking for records related to

Dr. Alexander Eastman and CBP's fentanyl policies and investigations, specifically requesting:

> 1. All of Dr. Eastman's August and September 2023 communications
> regarding fentanyl or other opioids.
> 2. The results of all prior CBP OPR investigations into Dr. Eastman,
> including for "improper ordering and procurement of narcotics."
> 3. The identity of Dr. Eastman's friend, the CBP helicopter pilot involved
> in Dr. Eastman's trip to New York City and whom Dr. Eastman attempted
> to hire into an OCMO leadership position.
> 4. All policies written by Dr. Eastman regarding procurement, storage, and
> disposal of Schedule II narcotics.
> 5. All communications between Dr. Eastman and any Deloitte employees
> beginning in May of 2023 until present.
> 6. All communications between Dr. Eastman and Elaine Duke, former
> United States Deputy Secretary of Homeland Security, beginning in May of
> 2023 to present.

96.     CBP assigned this request the tracking number CBP-FO-2024-076332.

97.     On March 20, 2024, CBP sent Plaintiff a response letter, again claiming that Plaintiff's

requested records were currently exempt under 5 U.S.C. § 552(b)(7)(A) because the requested records

were "currently part of an open and pending investigation and/or CBP action."

98.     A statutorily sufficient determination must include "the reasons for withholding any documents." *CREW*, 711 F.3d at 188.

99.     As in its prior letter, CBP's response letter did not include an affirmation of reasonably foreseeable harm should the records be released, nor did it analyze why reasonably foreseeable harm damaged an interest protected by the cited exemption.

100.     CBP cannot articulate a reasonably foreseeable harm as to why the requested records would damage an ongoing investigation, should one exist.

101.     Even if it had, CBP did not articulate the scope of records it would produce once its ongoing investigation ended.

102.     CBP did not segregate out the records clearly not covered by its claimed exemptions: Dr. Eastman's policy and the results of prior Eastman investigations.

103.     Therefore, this Court has jurisdiction because CBP has failed to issue a timely or satisfactory FOIA determination.

104.     Finally, CBP cannot deny Plaintiff's requests for policies written by Dr. Eastman. Under 5 U.S.C. § 552(a)(2), CBP must publish to its online reading room: "(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;" and "(C) administrative staff manuals and instructions to staff that affect a member of the public."

105.     Dr. Eastman's fentanyl policies should already have been made publicly available and thus must be made immediately available.

***Plaintiff's third FOIA letter notified CBP of its failure to obey the reading room provision as required by 5 U.S.C. § 552(a)(2).***

106.     On April 1, 2024, Plaintiff filed its third FOIA request with CBP.

107.     This third FOIA request notifies CBP of its failure to publicly post the following records:

i.   All policies written by Dr. Eastman regarding procurement, storage, and disposal of Schedule II narcotics.

ii.  All CBP policies and staff instructions, including those promulgated by the OCMO as required by or in accordance with the Synthetic Opioid Exposure Prevention and Training Act.

iii. Any and all OCMO policies or staff manuals or instructions, particularly those pertaining to fentanyl, Schedule II drugs, or opioid safety.

108.   Even if the policies or instructions themselves cannot be disclosed due to a FOIA exemption, the duty to segregate nonexempt records requires CBP to at minimum confirm the policies' existence by divulging policy and staff instruction titles and dates of issuance.

109.   Because Plaintiff's third request concerns only reading room records under § 552(a)(2), this Court has jurisdiction to order CBP to provide these records to Plaintiff.

110.   CBP's posting of responsive records in its reading room will alleviate the need to provide responsive records directly to Plaintiff.

111.   CBP's online FOIA reading room contains no policies or other (a)(2) records discussing a Chief Medical Officer or the Office of the Chief Medical Officer.

112.   There are apparently no responsive policies in CBP's online FOIA reading room either establishing OCMO, describing OCMO's duties, the Chief Medical Officer's authority, or policies issued by OCMO.

113.   A Boolean search of CBP's online FOIA reading room for the phrase "chief medical officer" yields no results.

114.   A search of CBP's reading room for "Chief Medical Officer"[26] or "CMO" also yields no records.[27]

---

[26] FOIA Reading Room, "Chief Medical Officer" search results, (accessed Mar. 27, 2024), https://www.cbp.gov/site-policy-notices/foia/reading-room?field_foia_category_list_value=All&title=Chief+Medical+Officer&year=.

[27] FOIA Reading Room, "CMO" search results, (accessed Mar. 27, 2024), https://www.cbp.gov/site-policy-notices/foia/reading-room?field_foia_category_list_value=All&title=CMO&year=.

115.    There is no CBP directive or policy authoritatively establishing the purview of the CBP Office of the Chief Medical Officer or its policy making role and authority.

116.    As of March 1, 2024, the Office of the Chief Medical Officer is not listed in CBP's online organizational structure.

117.    Despite having no acknowledged place in CBP's structure, no set policies, no official duties, and no powers, the CBP OCMO administers a $400 million-dollar medical services contract and has an annual budget exceeding a quarter billion dollars a year.

118.    CBP's failure to satisfy FOIA proactive disclosure requirements prevents the public from understanding CBP OCMO's role, responsibilities, organization, or powers.

***CBP public records reveal that CBP rapidly shifts OCMO's duties and responsibilities to suit its whim, indicating that OCMO lacks any definite, predetermined role.***

119.    Other publicly available records—although ones missing from CBP's online FOIA reading room—reveal that CBP leadership haphazardly foists duties and responsibilities on OCMO as it sees fit, sometimes switching OCMO responsibilities to other offices only to reverse itself soon thereafter.

120.    A 2019 CBP directive tasks the CBP CMO with providing required medical direction and oversight, consulting with DHS to ensure "CBP Medical Quality Management (MQM)," and consulting with DHS's Chief Medical Officer to ensure medical support efforts be coordinated with relevant stakeholders.[28]

121.    CBP reversed course in 2020, decreeing that "USBP Special Operations Headquarters (SOH)" would coordinate medical support efforts, Office of Field Operations would oversee CBP medical operations, while CMO was limited to providing "medical direction and oversight for OFO medical

---

[28] CBO Directive No. 2210-004, *Enhanced Medical Support Efforts*, ¶¶ 6.3.1.-6.3.3 (December 30, 2019).

support efforts" and coordinating with DHS to "ensure alignment with departmental requirements and policies."[29]

122.   In 2022, CBP shifted medical contractor responsibility from OFO to OCMO after a 2022 OIG report had found numerous flaws in the medical services provided by CBP's medical contractor to migrants in CBP custody.[30]

123.   In response, CBP charged OCMO with developing and implementing a plan to cure the defects identified by OIG. *Id.* at p. 9-10.

124.   There is no public record of OCMO having created a responsive plan addressing the OIG's findings.

125.   A 2023 budget overview describes the OCMO's role as dramatically larger,[31] including that it "provides medical direction, coordination, and oversight of medical support to CBP personnel, operations, and persons in custody.  The Chief Medical Officer (CMO) serves as CBP's principal adviser regarding medical issues and emerging health matters, priorities, and policies of critical importance to CBP" and "serves as CBP's lead medical representative."

126.   The budget allocated $291,785,000.00 to fund OCMO's work.

127.   The OCMO also enjoys some policy creation power of unknown scope and origin.[32]

---

[29] United States Border Patrol, *Implementation Plan Enhanced Medical Support Efforts,* ¶C.4, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jul/USBP-Medical-Directive-Implementation-Plan-CONOPS-only.pdf

[30] Department of Homeland Security, Office of the Inspector General, *CBP Needs to Strengthen Its Oversight and Policy to Better Care for Migrants Needing Medical Attention*, https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-48-Jul21.pdf (contractor "could not always demonstrate staff conducted required medical screenings or consistent welfare checks for all . . . medical cases we reviewed.").

[31] CBP – OS – 253, *available at* https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Customs%20and%20Border%20Protection_Remediated.pdf

[32] 2022 DHS Fiscal Report to Congress, *Implementation Status of Public Recommendations*, p. 27-28. (March 20, 2023) https://www.dhs.gov/sites/default/files/2023-04/OCFO%20-%20Implementation%20Status%20of%20Public%20Recommendations_Remediated.pdf ("CBP Operations Support (OS) Office of the Chief Medical Officer (OCMO) made significant progress toward

128.    As detailed by an OIG investigatory report, by 2024 OCMO's duties expanded even further to now include weekly contractor staffing inspections and overseeing contractor staffing levels.[33]

129.    According to CBP's death investigation policy, OCMO is also tasked with investigating in-custody deaths.

130.    Any policies authoritatively describing OCMO's powers or responsibilities remain hidden from public view.

131.    Given FOIA's transparency requirements, CBP OCMO is required to make its § 552(a)(1) and § 552(a)(2) records available to the public, including the OCMO policies, the fentanyl policy required by Congress, the reforms promised to OIG in 2022, and the fentanyl acquisition policy penned by Dr. Eastmann during his tenure as CMO.

### Plaintiff has alerted CBP of its failure to post its § 552(a)(2) records.

132.    CBP has had decades in which to create a system for the regular posting of § 552(a)(2) records to its online FOIA reading room.

133.    There is no need for a written request before filing a complaint for § 552(a)(2) FOIA violations.

134.    On the same day as this Amended Complaint was filed, AOL alerted CBP to its continued failure to properly post § 552(a)(2) records to its online FOIA reading room by sending a written notification to CBP using the CBP SecureRelease FOIA request system.

### CBP has some or all § 552(a)(2) records readily available for public distribution in its online FOIA reading room.

_____

refinement of oversight mechanisms for the implementation of policies and procedures concerning medical care for individuals in CBP custody.")

[33] Department of Homeland Security, Office of Inspector General, *Results of July 2023 Unannounced Inspections of CBP Holding Facilities in the Rio Grande Valley Area* (March 15, 2024)

https://www.oig.dhs.gov/sites/default/files/assets/2024-03/OIG-24-20-Mar24.pdf

135. As required by § 552(a)(2), internal CBP policy requires publication of certain key records, such as policies.[34]

136. As required by its own policy, CBP has already collected some or all of its § 552(a)(1) and § 552(a)(2) material and reviewed it for publication in its online FOIA reading room.

137. CBP Directive 5430-001 "Public Release of CBP Directives and Policy Directorate Memorandum" describes CBP's internal process for reviewing and then publishing its own policies:[35]

> 4.1 POLICY. All CBP Directives and PD Memos are required to undergo a specific series of internal review and clearance processes prior to public release and/or placement on an authorized, publicly accessible Government website.
> 4.2 CBP will take available and appropriate actions to embrace a culture of transparency, strengthen community engagement, increase its openness with the public as well as the media, and enhance Governmental accountability through the public release of CBP Directives and PD Memos.

138. While CBP is presumed to have followed its own directive in reviewing and collating all policies, CBP has not actually published its policies for public viewing in its online FOIA reading room.

139. Indeed, all of the CBP policies, directives, and handbooks actually cited on page 2 of Directive 5430-001 are not themselves publicly available on CBP's online FOIA library. The missing records include: CBP Handbook No. HB-1400-04A, Information Security Handbook, dated July 2016; and CBP Policy Memorandum, Integrating as One Agency: CBP Office Roles, Responsibilities, and Coordination, dated September 29, 2008.

140. Other undisclosed CBP policies, directives, and handbooks referred to by other CBP documents include, without limitation:

---

[34] Customs and Border Protection, *CBP Directive 5430-001 Public Release of CBP Directives and Policy Directorate Memorandums,* (May 9, 2022) https://www.cbp.gov/sites/default/files/assets/documents/2022-May/cbp-directive-5430-001-policies-publication-process_1.pdf.

     i.    CBP Directive 2110-040 "Records and Information Management Directive" (June 3, 2019)

     ii.    CBP Security Policy and Procedures Handbook (HB1400-02B)

     iii.    CBP Inspector's Field Manual

     iv.    Customs and Border Protection (CBP) Freedom of Information Act (FOIA) Standard Operating Procedures (SOP) 2017.

***CBP internally maintains a repository of all extant CBP policies, directives, manuals, and other similar documents on CBP.net.***

141.    As required by § 552(a)(2), CBP requires publication of certain key records, such as policies.

142.    Among the places where CBP keeps these policies is on its internal private network for CBP employees called "CBPnet." CBP describes CBPnet as:

> the official U.S. Customs and Border Protection (CBP) Intranet and is used exclusively by CBP employees and contractors. As the official Intranet, CBPnet provides a myriad of information and functions, such as CBP news and information, general Department of Homeland Security (DHS) business contact information, the CBP telephone directory, applications relevant to user roles and responsibilities, communication and collaboration tools, and internal and external resources. Additionally, users can access video and audio files, photo galleries, and official internal CBP forms, policies, and guidance to support operational activities. Authorized users with an official need to know can access trade regulations and rulings and legal cases impacting CBP and DHS. The CBPnet homepage is organized by divisions and program offices (e.g., Border Patrol, Air and Marine) with links that address relevant topics such as employee services, training, and technology support.[36]

143.    CBP does indeed store its policies and related material on CBPnet and makes those records readily available to CBP employees

---

[36] Customs and Border Protection, *Privacy Impact Assessment for the CBPnet*, p. 2 (May 10, 2017) https://www.dhs.gov/publication/dhscbppia-043-cbpnet.

144.    Screenshots of CBPnet confirm that CBPnet contains a repository of CBP policies, directives, and handbooks that have not been made available to the public in CBP's online FOIA reading room.

145.    The screenshots attached as Exhibit 2 show a menu of CBP offices "organized by divisions and program offices" at the top of a webpage followed by the words OFO "OTHER POLICY DOCUMENTS (Memos, Guides, Manuals, SOPs)."



146.    Exhibit 2contains twenty-five pages of OFO policy documents, including memos, guides, manuals and standard operating procedures ("SOP").

147.    Many of these records have not been posted to CBP's online FOIA reading room.

148.    On information and belief, every CBP office has a similar policy page containing its § 552(a)(2) records, including memos, guides, manuals and standard operating procedures ("SOP").

149.    These CBPnet policy collections must be made public in CBP's online FOIA reading room as is consistent with § 552 (a)(2).

## CLAIMS

### COUNT I: Violation of 5 U.S.C. § 552(a)(2)
### CBP's Failure to Publicly Post Records to CBP Online FOIA Reading Room

150.    Plaintiff re-alleges and incorporates by reference all the foregoing paragraphs in this Complaint as though fully set forth herein.

151.    CBP is in possession of Dr. Eastman's fentanyl policies, CBP's fentanyl safety policies, other OCMO policies, and other staff instructions.

152.    CBP possesses all § 552(a)(2) records on its internal network service CBPnet.

153.    § 552(a)(2) requires covered records—especially policies and staff instructions—to be made public in CBP's online FOIA reading room.

154.    CBP has not made these records public and has demonstrably not posted the full range of policies and staff instructions in its possession to its online FOIA reading room.

155.    Therefore, this Court should order CBP to produce those responsive § 552(a)(2) records, whether in whole or in part, so that Plaintiff may make those records publicly available online.

### COUNT II: Violation of 5 U.S.C. § 552(a)(6)(A)(i)
### Failure to Search for Responsive Records or Issue Timely Determination

156.    Plaintiff re-alleges and incorporates by reference all the foregoing paragraphs in this Complaint as though fully set forth herein.

157.    In response to valid FOIA requests, CBP must search for responsive records and make a timely determination.  *See* U.S.C. §§ 552(a)(3)(D); 552(a)(6)(A)(i).

158.    Plaintiff's first FOIA request asked for responsive records from February 16, 2019, to present.

159.    CBP did not search for responsive records dating from February 16, 2019, to present.

160.    CBP did not issue a valid determination to Plaintiff on its first request because CBP did not conduct an appropriate search.

161.    Satisfying FOIA requires that CBP conduct an appropriate search and issue a sufficient determination.

162.    Therefore, this Court should order CBP to conduct an appropriate search, issue a sufficient determination, and provide responsive records.

**COUNT III: Violation of 5 U.S.C. § 552(a)(6)(A)(i)**
**Failure to Issue Timely Determinations**

163.    Plaintiff re-alleges and incorporates by reference all the foregoing paragraphs in this Complaint as though fully set forth herein.

164.    Invoking § 552(a)(3), Plaintiff's first and second requests properly requested records within the possession, custody, and control of CBP.

165.    CBP violated FOIA by failing to issue appropriate and timely determinations in response to Plaintiff's requests.  Defendant must make a valid and complete determination and communicate that determination to the requester within twenty business days or thirty business days the agency invokes an unusual circumstances extension.  5 U.S.C. § 552(a)(6)(A)(i).

166.    A valid determination withholding records under an exemption requires an agency analysis and assertion that it is reasonably foreseeable that releasing the requested records would cause harm.

167.    A valid determination requires the agency to specify the scope of records it ultimately intends to release.

168.    Both of CBP's response letters fail to assert reasonably foreseeable harm, provide a foreseeable harm analysis, or specify the scope of records to be produced.

169.    CBP's failure to issue a timely or appropriate determination constructively exhausts administrative proceedings as to those requests, giving this Court jurisdiction.

170.   CBP should be ordered to issue a valid determination satisfying D.C. Circuit precedent.

**COUNT IV: Violation of 5 U.S.C. § 552(a)(8)(A)**
**Failure to Segregate Non-exempt Records**

171.   Plaintiff re-alleges and incorporates by reference all the foregoing paragraphs in this Complaint as though fully set forth herein.

172.   CBP is obligated to "(I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and (II) take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A).

173.   Even if CBP had properly invoked an exemption and issued an appropriate determination, CBP failed to segregate nonexempt records, including the policies and prior investigations in Plaintiff's second request.

174.   This Court should order CBP to segregate non-exempt records and make those records available to Plaintiff.

**COUNT V: Violation of 5 U.S.C. § 552(a)(3)**
**Improper Withholding of Non-Exempt Responsive Records**

175.   Plaintiff re-alleges and incorporates by reference all the foregoing paragraphs in this Complaint as though fully set forth herein.

176.   Plaintiff properly requested records within the possession, custody, and control of CBP.

177.   CBP is an agency subject to FOIA and must therefore make responsive records promptly available in response to a properly filed request. 5 U.S.C. § 552(a)(3)(A).

178.   CBP's failure to promptly make responsive records available to Plaintiff violates FOIA.

179.   CBP should be ordered to make Plaintiff's § 552(a)(3) records promptly available.

## **REQUEST FOR RELIEF**

For these reasons, AOL asks that the Court grant the following relief:

1.    Order CBP to immediately issue a statutorily sufficient determination responsive to Plaintiff's first and second FOIA requests;

2.    Order CBP to produce, within twenty days of the Court's order, or by a date deemed appropriate by the Court, non-exempt records responsive to AOL's first and second FOIA requests and *Vaughn* indices justifying the withholding of responsive records pursuant to FOIA exemptions;

3.    Order CBP to produce to Plaintiff, within twenty days of the Court's order, or by a date deemed appropriate by the Court, all non-exempt § 552(a)(2) records;

4.    Enjoin Defendant from continuing to withhold any and all non-exempt records responsive to AOL's FOIA request;

5.    Award AOL reasonable attorneys' fees and other litigation costs reasonably incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

A.    Award all other and further relief the Court deems just and proper.

Dated: June 25, 2024                              Respectfully submitted,

                                 /s/ Andrew Fels              a
                                Andrew Fels DC BAR:TN0025
                                AL OTRO LADO
                                P.O. Box 907
                                Maywood, CA 90270
                                Telephone: (865)-567-4881
                                Facsimile: (323) 430-8793
                                andrew@alotrolado.org

                                *Attorney for Plaintiff Al Otro Lado*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular United States Mail, postage prepaid. Parties may access this filing through the Court's electronic filing system.

 /s/ Andrew Fels          a
Andrew Fels DC BAR:TN0025
AL OTRO LADO
P.O. Box 907
Maywood, CA 90270
Telephone: (865)-567-4881
Facsimile: (323) 430-8793
andrew@alotrolado.org

*Attorney for Plaintiff Al Otro Lado*